# EXHIBIT "A"



COPY



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

BOBBY J. GOLDEN,
Plaintiff,

VERSUS CAUSE NO: 1:06cv1006LG-JMR

HARRISON COUNTY, MISSISSIPPI; SHERIFF GEORGE PAYNE, OFFICIALLY AND IN HIS INDIVIDUAL CAPACITY; LEE OATIS JACKSON, OFFICIALLY AND IN HIS INDIVIDUAL CAPACITY; MAJOR DIANNE GASTON-RILEY, OFFICIALLY AND IN HER INDIVIDUAL CAPACITY; CAPTAIN RICK GASTON, BOOKING SUPERVISOR, OFFICIALLY AND IN HIS INDIVIDUAL CAPACITY; CAPTAIN PHILLIP TAYLOR, OFFICIALLY AND IN HIS INDIVIDUAL CAPACITY; JOHN DOES 1-5, OFFICIALLY AND IN THEIR INDIVIDUAL CAPACITY,
Defendants.

**DEPOSITION OF BOBBY J. GOLDEN**

Taken at the offices of Dukes, Dukes, Keating & Faneca, P.A., 2909 13th Street, Sixth Floor, Gulfport, Mississippi, on Friday, February 15, 2008, beginning at 9:56 a.m.







incidents that you've alleged in your complaint. It seems to me they're kind of broken into three areas, the booking area, what I'll call the juvenile incident, and then the incident regarding Deputy Jackson.

What I'd like for you to do is kind of begin with what you were doing prior to being arrested on February 26th, 2007.

A. What do you mean what I was doing?

Q. What did you do on the day before you were arrested?

A. Well, I was drunk. I got arrested for domestic violence.

Q. Okay. But what had you been doing that day?

A. I had went to work.

Q. Okay. Do you recall what day that was, like the day of the week?

A. Friday.

Q. It was a Friday. So you had been at work that day?

A. Yes.

Q. And then you got off work. What happened after you got off work?

A. Well, I went to a club and started





drinking.

Q. What club did you go to?

A. I think it was Sammy D's back then.

Q. Is that in Gulfport?

A. Yes.

Q. Is it still in operation?

A. No. The storm.

Q. And so you got off work and went to Sammy D's?

A. And went by a girlfriend's house.

Q. Okay. What's her name?

A. Nadia Cenales.

Q. Nadia Cenales. Could you spell Cenales?

A. C-e-n-a-l-e-s.

Q. Okay. About what time did you go over there?

A. It was at nighttime. I guess about 10:00, 11:00.

Q. Okay. And how much had you had to drink prior to that?

A. Probably a 12 pack or better.

Q. Is that what you normally drink?

A. Yes.

Q. How often do you drink a week?

A. It used to be every day, but I don't





drink no more.

Q. Okay. But at the time, you were drinking every day?

A. Every day.

Q. At least a 12 pack?

A. Yes.

Q. So you arrived there at 10:00 or 11:00. What happened next?

A. Me and her got in an argument, and her roommate called the police.

Q. And what's her roommate's name?

A. I can't remember her full name. Her last name is Cenales.

Q. So it's her sister or --

A. It's her cousin.

Q. Cousin. What did you get in an argument over?

A. About another guy.

Q. Okay. And what's his name?

A. I don't even know him.

Q. And what was the argument over the other guy?

A. About him being there.

Q. I'm sorry.

A. About him being there.






A. (Shrugging shoulders.)
Q. Okay. But you remember everything else?
A. Yes.
Q. Okay.
A. I know I wasn't laying on no ground.
Q. When the police arrived?
A. Yes.
Q. Did you assault Ms. Cenales?
MR. COOPER:
Objection.
A. Yes.
MR. TINER:
Q. Okay. But you will admit to that part of this narrative?
A. Yes.
Q. Okay. Was there an Ernest Earl Phillips there?
A. I don't even know him.
Q. Okay. Was there another man there?
A. Yes.
Q. Okay. Do you recall kicking a door?
A. No.
Q. Do you recall punching Ms. Cenales in the face?
MR. COOPER:





Objection. Asked and answered.

MR. TINER:

Q. You can answer.

A. Oh, yes.

Q. Okay. Do you remember any struggle with the gentleman that was there?

A. No.

Q. Okay. You don't remember or it didn't happen?

A. There wasn't no struggle.

Q. Okay. Do you recall defecating or urinating on yourself?

A. No.

Q. Whenever the officers arrived, what happened?

A. Well, it wasn't but one officer. He came in and asked what had happened, and Nadia was explaining that we had got in an argument and that I had jumped on her. So that was all he needed to hear, so he took -- put me in the car.

Q. Did he put handcuffs on you?

A. Yes.

Q. And did you threaten to kill anybody while you were there?

A. No.







Q. What did he look like?
A. Short guy, sort of stocky.
Q. Was he white?
A. White.
Q. And he was in the -- behind the glass in the booking area?
A. Yes.
Q. And then what happened next?
A. Well, I beat on the door and he kept telling me, stop beating on the door.
Q. Had your handcuffs been removed at that time?
A. Yes.
Q. Okay. What door were you beating on?
A. Booking room door.
Q. And the officer that was behind the glass was next to this door?
A. He was like in front of it.

MS. BROOM:

All right. The booking room door, what door are you talking about there? Clarify that a little bit.

THE WITNESS:

The holding cell door.

MS. BROOM:





So you were in the holding cell?

THE WITNESS:

Yes.

MR. TINER:

Q. And you were beating from inside the holding cell?

A. Well, not beating. Knocking on it. It might have been beating to him.

Q. Okay. Well, if you would, describe how you were knocking.

A. Well, I knocked like -- you know, how you tap on the glass. I kept asking to use a phone call. He said, like, just wait till, you know, we process you. So I kept asking and kept asking. So I guess it must have irritated him, so he opened the door and punched me in the eye.

Q. Okay. This is that same officer, the short guy?

A. The same short guy, same officer, yes.

MS. BROOM:

When you were talking to him asking to use the phone, were y'all talking through the wall or did he open --

THE WITNESS:

Through the glass.







THE WITNESS:

In the shower.

MR. TINER:

Q. So he came in your cell?

A. Yes.

Q. Did he issue any commands for you to sit down or, you know, stop yelling?

A. Just shut up and wait till we get to you.

Q. And did you continue after he gave that instruction?

A. Yes.

MR. TINER:

Can we take a quick break?

(Off the record.)

MR. TINER:

Q. Back to the booking area.

Now, you say that whenever you came in, your handcuffs had been removed and you were placed in a holding cell?

A. Yes.

Q. And then you began asking for your phone call and asking what the charges were against you, correct?

A. Correct. Yes.







Q. Okay. So you were acting -- what does that mean to be intoxicated? Do you act differently when you're intoxicated?

A. I possibly was a little mad, but --

Q. Okay. And what is "a little mad"?

A. I guess mad enough to wind up in jail.

Q. But I'm not talking about the domestic violence incident. I'm talking about now that we're in the booking room.

You said you were mad and knocking on the door. But you were drunk; is that correct?

A. Well, I was just trying to bond out.

Q. But you were mad at the time, you were angered?

A. I guess, yes.

MS. BROOM:

Did you ever make any aggressive steps towards the officer?

THE WITNESS:

Oh, no.

MR. TINER:

Did you ever physically touch the officer?

THE WITNESS:

No. No. I couldn't touch him because I



