Q. Okay. It was just one person or --

A. It was three people, three juveniles.

MS. BROOM:

Where were you at this time?

THE WITNESS:

Lying down on the floor.

MS. BROOM:

Were you inside a cell locked down?

THE WITNESS:

We couldn't get in no cells because like I say, the adult inmates was out in the bullpen and the juvenile inmates was like locked down in the cell blocks.

MS. BROOM:

The juvenile inmates were locked down?

THE WITNESS:

Well, they was coming back in from the recreation.

MS. BROOM:

Outside?

THE WITNESS:

Outside.

MS. BROOM:

And the adult inmates were in the -- they typically call it the dayroom?







us some extra tray for jumping on him or something like that. And his friend said, y'all shouldn't have jumped on that old guy, and then he wanted to know what it was about. No answer come out about what it was or nothing.

Q. And this is when you had been called to Officer Taylor's office for an investigation?

A. Yeah. Some officer had complained about I was in pain.

Q. And y'all are all standing around outside his office together?

A. Who?

Q. You and the juveniles.

A. No. They took the juvenile on to the doctor and took me to Captain Taylor.

Q. But where were you standing when you heard these statements?

A. In the hallway.

Q. In the hallway where?

A. Coming out of the section.

Q. On the way to Captain Taylor's office?

A. On the way actually to the doctor. They just stopped me by Captain Taylor's office.

Q. And when you say "doctor," do you mean the nurse's office --







A. The nurse's office.

Q. -- there at the jail?

A. Yes.

Q. Okay. What parts of your body were injured as a result of this incident?

A. I had a fractured rib, a cut over my eye, and then I had a cut right up under my chin.

Q. Cut over the eye and then under the chin. Any other injuries?

A. And my back was hurting.

Q. How was it hurting?

A. It was like -- I guess like I had pulled a muscle or something.

Q. And were you treated by a nurse at the detention center?

A. Yes.

Q. Okay. What did she do to treat you?

A. Pardon me?

Q. What did she do to treat you?

A. Nothing. Just pressed against my ribs, you know, to see was they broke.

Q. Did she take any x-ray of your ribs?

A. No. They gave me some ibuprofen.

Q. Anything else? Did you get any bandages on your cuts?







Q. And what were your complaints during --

A. Same thing. My rib, my back, and my shoulders.

Q. No X-rays were performed at the time?

A. No.

Q. And were you given any medication?

A. Ibuprofen 600 milligram.

Q. Each time?

A. Yes.

Q. Okay. And then what happens after your 15 days in isolation?

A. They let me go.

Q. Okay. You were released from the jail?

A. Yes.

Q. And when did the incident with Deputy Jackson occur?

A. Right after the juveniles had jumped on me. Like I say, it was the day after, Sunday.

Q. The day after the juvenile incident?

A. The day after the juvenile incident.

Q. What happened then?

A. He -- him and his officer came down to get me to make it look like I guess -- well, they told me they was about to take me to see the nurse.






A. Started punching me in my ribs and stomach. I fell down, and he started kicking me.

Q. Okay.

A. So then he picked me up, he told me, he say, get up, get up. So I was scared to get up because I thought he was going to start back punching and kicking. So he picked me up and brought me back in the -- in the area. And then I didn't want to go back into that cell block because I thought the juveniles was going to jump on me, thought he was, you know, going to make them jump on me again.

Q. Okay. Were you resisting?

A. No. I wasn't resisting.

Q. Okay.

A. And then he say, lock him up in isolation, and that's when I started resisting because I said, no, I'm not going to no isolation. I figured you go to isolation -- isolation is pretty bad.

Q. What do you mean it's bad?

A. You isolated.

Q. Okay. But you started resisting at that point?

A. Yeah.






Q. Okay. So how were you resisting going back in the cell?

A. Nothing. I just told him I wasn't going back in there.

Q. Okay. Was there any physical altercation?

A. No.

Q. You just said, I'm not going?

A. I just said, I'm not going.

Q. What happened? What response did you receive when you said --

A. Well, when I told him I wasn't going -- he told the other officer that I was telling you about, that took me to isolation.

Q. So there was no physical altercation?

A. No. No. It was just words. That's it.

Q. Were you cussing at the time?

A. No.

Q. Were you handcuffed at the time?

A. No.

Q. Eventually you ended up in isolation?

A. Yes

Q. Were there any witnesses to the altercation with Officer Jackson?

A. There wasn't no altercation. He jumped





Q. And what did she call up to the jail for?

A. Called up to talk to the sheriff. She had found out I had got beat.

Q. Did she speak with the sheriff?

A. No.

Q. Who did she speak with?

A. I don't know who she -- I forgot who she spoke to, but it had to be somebody that was higher. It wasn't the sheriff, though.

Q. But she informed whoever it was that you had had an altercation in the jail?

A. Yes.

Q. While you were in jail, did you file any grievances?

A. No.

Q. Okay. Did you verbally tell any officers about what happened to you while you were in isolation?

A. The officer, the one that took me to isolation, he was a pretty decent officer and he knew what had happened and, you know, him and I was talking.

Q. And you don't remember his name?

A. I can't remember his name.






A. Yes. I would think they is. If they wasn't, they wouldn't have been trying to hurt me.

Q. Okay. But do you believe they were based on race? Was it a racial discrimination?

A. I don't know. I don't think so.

Q. Okay. How about based on your age? Were they discriminating against you on your age?

MR. COOPER:

Objection.

A. I don't know.

MR. TINER:

Q. How about your religion on your national origin?

A. No, it couldn't have been, couldn't have been my religion.

Q. Okay. I'm going to Count Number 3, which is action for neglect or failure to prevent conspiracy.

What facts support this cause of action?

A. What do you mean by that?

Q. What facts that we've discussed today support a cause of action for neglect or failure to prevent conspiracy, if you're aware?

MR. COOPER:

Again, I object. It calls for a legal






could, answer with a simple yes or no. Okay?

A. Yes.

Q. Let's go back to this alleged incident that happened with, you said, the juveniles. Okay?

A. Yes.

Q. I'm looking at your complaint, which I think has been marked as Exhibit 3. It's Number 13. You state there that on February 26th, 2005, Deputy Sheriff Lee Oatis Jackson caused two juvenile detainees to beat Plaintiff Golden; is that accurate?

A. Yes.

Q. To your knowledge, that's accurate?

A. Yes.

Q. Lee Oatis Jackson, he doesn't work in booking, does he, at the Harrison County Jail?

A. No. He don't work in booking.

Q. With respect to that incident with the juveniles that allegedly occurred, are you aware of any booking correctional officer that was present at the Harrison County Adult Detention Center when that happened?

A. With the juveniles?

Q. Yes, sir.







A. No.

Q. Okay. Are you aware of any booking correctional officers at the Harrison County Adult Detention Center that even talked about it? Are you aware of any conversations that they had about that incident, in booking? I'm asking about booking. Did you ever hear a conversation with a booking officer?

A. Oh, with the officers, no.

Q. No booking officers, right?

A. No.

Q. And do you even the know names of any of the booking officers at the Harrison County Adult Detention Center?

A. No.

Q. Have you ever spoken to Rick Gaston before?

A. I can't remember. I don't know.

Q. So you wouldn't have any reason to dispute that you haven't spoken to him before, right?

MR. COOPER:

Asked and answered. He said he didn't know.

MR. BRENDEL:



