# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**BOBBY J. GOLDEN**                                                      **PLAINTIFF**

**VERSUS**                                          **CASE NO. 1:06cv1006LG-JMR**

**HARRISON COUNTY, MISSISSIPPI;
SHERIFF GEORGE PAYNE, OFFICIALLY
AND IN HIS INDIVIDUAL CAPACITY;
LEE OATIS JACKSON, OFFICIALLY AND
IN HIS INDIVIDUAL CAPACITY; MAJOR
DIANNE GASTON-RILEY, OFFICIALLY
AND IN HER INDIVIDUAL CAPACITY;
CAPTAIN RICK GASTON, BOOKING
SUPERVISOR, OFFICIALLY AND IN HIS
INDIVIDUAL CAPACITY; CAPTAIN
PHILLIP TAYLOR, OFFICIALLY AND IN
HIS INDIVIDUAL CAPACITY; JOHN DOES
1-5, OFFICIALLY AND IN THEIR INDIVIDUAL
CAPACITY**                                                      **DEFENDANTS**

STATE OF MISSISSIPPI

COUNTY OF HARRISON

### <u>AFFIDAVIT OF STEVE CAMPBELL</u>

PERSONALLY CAME AND APPEARED BEFORE ME the undersigned authority

in and for the County and State aforesaid, the within named, STEVE CAMPBELL, who,

after first being duly sworn by me on his oath, did depose and state the following:

    1.    My name is STEVE CAMPBELL , and I am over the age of twenty-one (21)

years.  I was a Captain with the Harrison County Sheriff's Office and I was

the Captain for the Professional Standards Unit for the Harrison County Adult

Detention Center.  I have personal knowledge of the matters and facts



EXHIBIT

B

contained in this Affidavit and I am competent to testify to the matters stated herein.

2.    As Captain for the Professional Standards Unit, I am charged with the responsibility of conducting internal administrative investigations and applicant background development.  The Professional Standards Unit of the Harrison County Adult Detention Center has the primary responsibility of investigating complaints of alleged employee misconduct pursuant to General Order #65, Professional Standards Unit, which is attached hereto as **Exhibit "1"**.

3.    The attached records are a true and correct copy of General Order #65, which represents the Professional Standards Unit Policy of the Sheriff of Harrison County in effect as of October 1, 2002, and the General Order #65 was prepared in the regular course of business activity.

4.    On March 3, 2005, Sheriff Payne directed the Internal Affairs Unit to investigate the allegations that Inmate Bobby Golden had been assaulted by juvenile inmates at the instruction of one or more correction officers.  During such investigation, I received and reviewed written reports by Captain Taylor, FTO Shane Carson, and Deputy Michael Marble regarding these incidents with Inmate Bobby Golden.  Allegations were made that Correction Officer Lee Jackson had solicited the help of juvenile inmates to attack Bobby Golden in retaliation for Golden attacking Deputy Jackson's former girlfriend.

5.    During my interview with Inmate Golden, Inmate Golden alleged that on February 26, 2005, as Plaintiff was housed in the Classification Section B/F, he was awoken by someone beating him about the head and kicking him in

the abdomen area. Golden informed me that he was unable to identify who attacked him because he was asleep when the alleged attack occurred. Golden further alleged that on February 27, 2005, Deputy Lee Otis Jackson, who Plaintiff knew to be the former boyfriend of the female that Golden had assaulted prior to arriving at the jail, took Plaintiff to the recreation yard and assaulted him by hitting and punching him several times.

6.    Campbell interviewed Deputy Lee Otis Jackson and Jackson admitted that he had in fact hit Golden while in the recreation yard because Golden assaulted his former girlfriend in front of Jackson's children.

7.    I was unable to substantiate the allegation that correctional officers had instructed the juvenile inmates to attack Bobby Golden.

8.    I advised Jackson that he would be placed on administrative leave that day and would be contacted regarding an Administrative Hearing.

9.    I was later informed that during the administrative hearing, Deputy Jackson stated that FTO Shane Carson had instructed Deputy Jackson to assault Inmate Golden. Therefore, I was further advised by Sheriff Payne to expand my investigation regarding FTO Shane Carson's alleged involvement. Shortly thereafter, I obtained additional reports and documents, conducted additional interviews, and requested FTO Carson to submit to a polygraph examination. However, my investigation concluded that the allegation that FTO Shane Carson suggested retaliation against Inmate Golden were unfounded.

10.    It was concluded from my investigation that Deputy Lee Otis Jackson did in fact assault Inmate Golden in retaliation for Golden assaulting Deputy

Jackson's ex-girlfriend in front Deputy Jackson's children. Deputy Jackson was charged with violating General Order #1, 5.8 "...his office gives him no right to prosecute the violator or to meet out punishment for the offense..."

11.    Pursuant to General Order #65, I maintained files of all my internal investigations. I have attached hereto as **Exhibits "2-8"** relevant portions of the investigative file of case number IA2005-06. More specifically, **Exhibit 2**, is the Internal Affairs Report dated March 15, 2005; **Exhibit "3"** is Narrative form completed by FTO Shane Carson; **Exhibit "4"** is the Narrative form completed by Deputy Geas; **Exhibit "5"** is the Polygraph examination documents regarding Shane Carson; **Exhibit "6"** is the interview transcript between Captain Campbell and Bobby Golden; **Exhibit "7"** is the interview transcript between Captain Campbell and Lee Otis Jackson; **Exhibit "8"** is the letter of disciplinary action taken against Lee Otis Jackson; **Exhibit "9"** is the video surveillance of Plaintiff in booking department.

12.    At all relevant times, I was the Captain of the Internal Affairs Unit at the Harrison County Adult Detention Center and had first hand knowledge of the maintenance and/or storage of the attached records; and the attached records are true and correct copies of portions of the IA file; Case No. IA2005-06 involving inmate Bobby Golden; and the records were generated in the regular course and pursuant to the regular activities of and duties of the Internal Affairs Unit, as well as upon the office of the Harrison County Sheriff, and were made at or near the time of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

I certify the above declaration is true and correct under penalty of perjury.

_____
Affiant Steve Campbell
Harrison County, Mississippi

Sworn to and subscribed before me on this the ____7____ day of July, 2008.

_____
Notary Public

My Commission Expires:

__10 - 19 - 05__

(SEAL)

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 5043
LAURA ANN HOYT
Commission Expires
Oct. 19, 2009
JACKSON COUNTY

General Order #65
Harrison County Sheriff's Department
October 1,2002

George Payne, Jr, Sheriff

## PROFESSIONAL STANDARDS UNIT

1. **PURPOSE**

    The purpose of this order is to establish the policy for managing and staffing the Professional Standards Unit of the Harrison County Sheriff's Department. This policy will outline the procedures for investigating complaints of misconduct.

2. **SCOPE**

    This policy is directed to all department personnel.

3. **POLICY**

    The Harrison County Sheriff's Department Professional Standards Unit shall be responsible for conducting internal administrative investigations and applicant background development.

    This policy shall define the methods of investigation and discipline in order to ensure the protection of employees' rights through the conscientious investigation and ultimate disposition of each inquiry. This policy shall ensure the integrity of the department by establishing procedures that provide an investigation of any matter that might affect the efficient, professional operation of the department, and mandated compliance with all general orders.

    A. **Internal Investigations Authority**

    Internal inquiries and investigations are performed under the authority of the Sheriff. The Professional Standards Unit shall have the primary responsibility of investigating complaints of alleged employee misconduct. The Professional Standards Unit will operate under the supervision and direction of the Sheriff. All orders written or verbal issued in connection with any internal investigation shall be considered as direct orders from the Sheriff. The final authority to exonerate, declare unfounded, not sustained, or to sustain any complaint rests solely with the Sheriff. Internal inquiries are administrative and should not be construed as criminal investigations.

General Order #65 - October 1, 2002                                          1



EXHIBIT
B-1

**B.  Disciplinary Review**

Members of the Professional Standards Unit may be required to attend  Disciplinary Review Hearings subsequent to internal investigations. The sole purpose will be to provide the facts and circumstances surrounding the respective cases.

**C.  Civil Service Meetings**

A representative of the Professional Standards Unit may be requested to attend regular or special civil service meetings for providing insight on disciplinary actions occurring inside the department.  The representative's responsibility is solely to inform the Civil Service Commissioners of results of particular investigations.

**D.  PSU Area of Investigative Responsibility**

The Professional Standards Unit will investigate serious or sensitive allegations of misconduct and incidents resulting in actual or potential litigation against the county, the Sheriff's Department or employees of the Sheriff's Department. Any such investigation shall be performed under the guidelines of appropriate county policies and Mississippi Statutes.

## Legal Action

The Professional Standards Unit may investigate any pending legal action against the department or it's employees. Upon receipt of such information, a case file will be established which will contain all pertinent information on the action and any request for information.

**E.  Shift Supervisor Area of Responsibility**

The appropriate immediate supervisor will investigate complaints of less serious violations. This assignment shall not relieve the Professional Standards Unit from lending assistance when requested or monitoring the investigation.

The Supervisor receiving an external complaint or filing an internal complaint is responsible for preserving evidence to include taking documentary photographs when practical and possible. The Supervisor shall take photographs of complainants in all excessive force complaints even if injuries are not visibly present.

General Order #65 - October  1, 2002                                    2

F. Complaints:

*__All external complaints will be documented on a Citizen Complaint Form.__*
Complaints may be received in a variety of ways including, but not
limited to: (a) in person (b) by mail (c) telephone (d) email (e) third party
*Anonymous complaints are investigated, but have limitations caused by the
inaccessibility of the complainant.*

Procedure for Citizen Inquiry

A citizen alleging misconduct on the part of any employee shall be
directed to the supervisor on duty regardless of the time of day.  The
supervisor may be able to resolve the complaint without the assistance
of the Professional Standards Unit.  Many complaints of alleged
misconduct can be handled by the Shift Commander or a supervisor,
provided it is done in a professional and timely manner.  Unless the
complaint involves gross misconduct or a criminal violation, the Shift
Commander or supervisor should make every attempt to resolve the
matter without involving the Professional Standards Unit.

If the shift supervisor cannot resolve the complaint satisfactorily or there
is an allegation of a criminal nature, the shift supervisor shall complete
the Citizen Complaint Report and forward this form to the Professional
Standards Unit without delay.

In the event a citizen directly contacts the Professional Standards Unit
when initially registering the complaint, the Professional Standards Unit
will be responsible for referring the complaint to the affected supervisor
or completing the Citizen's Complaint Report and other necessary
documentation.

Traffic Citations/ Arrests

Complaints relative to differences of opinion between an officer and a
citizen over the issuance of a traffic citation or regarding guilt or
innocence subsequent to an arrest, shall not be investigated by the
Professional Standards Unit, but will be properly handled by the judicial
system.

G. Use of Citizen Complaint Report

1. Personnel receiving the complaint shall have the citizen sign the
   Citizen Complaint Report in their presence.  The substance of the
   complaint shall be documented in the appropriate section of this form.

General Order #65 - October 1, 2002                                          3

2. Under no circumstances shall the Citizen Complaint Report be used as a means to threaten, intimidate, harass or discourage a citizen from making a complaint.

3. Should the citizen refuse to sign the complaint report, the receiving supervisor shall complete the report and document the refusal to sign. A memorandum concerning the allegations shall also be made. The report shall be signed in the space provided for supervisor receiving the complaint. The completed report shall be forwarded to the Professional Standards Unit without delay.

H. Internal Complaint Procedure

In furtherance of the intent of this policy, any employee may submit a written statement, documenting employee misconduct, directly to the Professional Standards Unit which shall process the complaint in accordance with this general order.

I. Written Counseling Form

Written Counseling Forms shall be utilized to document an employee's unsatisfactory performance or to document an incident involving employees. Written Counseling Forms in some cases shall serve as a written consultation. A copy of all the internal complaints or incidents shall be forwarded to the Professional Standards Unit.

If the supervisor believes the complaint, either external or internal, is of such a serious nature that it requires immediate attention, or he needs assistance, he shall contact the Sheriff or the appropriate Director within his chain of command, who shall determine if the complaint requires immediate assistance or the assignment of personnel from the Professional Standards Unit. If the appropriate Director deems that the complaint should be investigated by the Professional Standards Unit, the Director shall make the request to the Sheriff.

J. Initial Investigation Procedures

1. Upon receipt of the documentation and approval of the Sheriff, the Professional Standards Unit shall determine which general order(s), policies or statutes were violated.

2. Should a formal investigation be ordered, an *Initial Notice of Inquiry Report* shall be drafted and forwarded to the affected employee through the chain of command, except under the following circumstances:

   (a) The alleged violation is ongoing.
   (b) The investigation possibly would be compromised by the release of the information.

General Order #65 – October 1, 2002                                    4

3. Garrity warnings shall be given to employees and signed prior to all formal interviews whereby the possibility of criminal conduct may be alleged. When there is no criminal conduct alleged, employees interviewed by the Professional Standards Unit will be advised of the authority of the investigation as well as requirements of complete truthfulness and candor. This will be documented on an audio recording tape.

### K. Classification of Allegations

The Professional Standards Unit investigator shall, in the Internal Investigative Report, recommend 1 of the following 5 classifications:

1. Unfounded- the allegation is false or not factual.

2. Exonerated- the incident occurred, but was lawful and proper.

3. Not Sustained- there was insufficient evidence to prove or disprove the allegation.

4. Sustained- the allegation is supported by a preponderance of evidence to justify a reasonable conclusion that the incident did occur.

5. Policy Failure- the policy was not specific or did not cover this incident.

### L. Internal Investigations

1. Internal Complaints will be assigned an IA# by the Professional Standards Unit OIC.

2. The complaint will then be assigned to a Professional Standards Unit Investigator by the OIC.

Each internal investigative report will contain:

1. The general order(s) violated.
2. The details in chronological order, addressing each point of accusation.
3. A synopsis of each witness statement.
4. Mitigating circumstances, if appropriate.
5. Recommended classification of the allegations

### M. Case File Preparation:

*Unless special circumstances occur, all internal investigations must be completed within thirty days. An extension may be given by the Professional Standards Unit OIC or the Sheriff.*

General Order #65 - October 1, 2002                                    5

Each case file and report will contain the site or copies of the general orders violated. In addition, each case file will include letters and memos relevant to the investigation. All reports must include an investigator's finding and conclusions. Findings and conclusions should be a summary listing of relevant conclusions drawn by the investigator based on facts and circumstances of the investigation and a recommended classification of the allegations shall be provided by the Investigator. The Professional Standards Unit shall not make any recommendations regarding disciplinary action. All Garrity statements, including audio or video tapes of such interviews, must be filed separately from the investigative file in an envelope marked "Garrity statement" and filed accordingly.

N. Dispositions

1. Informal Personnel Actions- Actions documented on a Written Counseling Form shall be processed by forwarding a copy of the Written Counseling Form to the Professional Standards Unit for record.

2. Formal Discipline- A copy of the Formal Discipline Report, (letter of suspension, termination, etc.) shall be maintained in the affected employee's personnel file as defined in the department General Orders and a copy to be maintained in the Professional Standards Unit file.

O. Corrective Actions

1. Informal Personnel Action- When practical informal actions should be positive and educational rather than punitive in nature. The employee's immediate supervisor will complete all informal personnel actions.

2. Formal Discipline- Construed to be punitive in nature. It includes, but shall not be limited to:

(a) Written Reprimand
(b) Demotion
(c) Suspension
(d) Termination

P. Procedural Due Process

1. Prior to awarding any level of informal personnel action or formal discipline, the recommending authority may contact the Professional Standards Unit in order to determine the record of the offending employee and the consistent level of personnel action or discipline for the violation.

General Order #65 - October 1, 2002                                    6

2. **Required Actions**- The following steps will be taken to ensure due process:

    (a) The employee must be informed of the charge(s) against him/her.

    (b) The employee must be given an explanation of the evidence underlying the charge(s).

    (c) The employee must have the opportunity to respond to the charge(s).

    (d) All notices and hearings must be done in a meaningful time and a meaningful fashion.

If the internal investigation classifies the case as either exonerated, not sustained, unfounded or policy failure, the employee(s) involved will receive a letter of disposition.

Q. **Reviews, Appeals and Grievances**

All appeals and grievances shall follow procedures herein and established by the Harrison County Civil Service Commission and Department Policy. The Sheriff and all Division OIC personnel may review all informal and formal personnel actions.

<u>Obstruction of Internal Investigation</u>

No employee shall by writing, speaking, utterance or any other means commit an act which would hinder or obstruct an authorized internal investigation by the Harrison County Sheriff's Department.

<u>Confidentiality of Investigations</u>

All complaints and complaint investigations will be confidential and will not be discussed within or outside the department without approval of the Sheriff or his designee.

<u>Unauthorized Internal Investigation</u>

No employee shall initiate, conduct, or otherwise participate in any unauthorized investigation.

<u>Other Administrative Investigations</u>

**Officer Involved Shootings**

The Harrison County District Attorney's Office shall be responsible for conducting an independent investigation of all shootings involving officers of the Harrison County Sheriff's Department. The Sheriff may request other independent investigations by the Mississippi Highway Safety Patrol or other law enforcement agencies. The Harrison County Sheriff's Department Professional Standards Unit will conduct all internal investigations.

General Order #65 - October 1, 2002               7

## Background Investigations

Background investigations of applicants including sworn, non-sworn and reserves, will be conducted by the Professional Standards Unit. A background investigation by the Professional Standards Unit may be requested by any Director when the Director is informed of a need to begin the hiring process of applicants. The PSU investigator will be given a checklist of needed information, and the items on the list will be noted as to time and date of completion. Upon completion of the investigation the application will be returned to the personnel officer with a cover sheet indicating whether or not the applicant passed the background process. In addition, a copy of the cover sheet will be forwarded to the Sheriff and the affected Director. Without the approval of the Sheriff, applicants shall not be offered employment until after a satisfactory background investigation has been completed and it is determined that the candidate is suitable for the position which he/she has applied.

General Order #65 - October 1, 2002                                                8

# HARRISON COUNTY SHERIFF'S DEPARTMENT
## PROFESSIONAL STANDARDS UNIT

| File Name<br>**Deputy Lee Jackson** | Date of Report<br>**March 15, 2005** | Date Assigned<br>**March 3, 2005** |
|---|---|---|
| Type Investigation<br>**Internal Investigation** | Case Number<br>**IA2005- 06** | |

On March 3, 2005, Sheriff Payne directed Capt. Campbell to investigate allegations that Inmate Bobby Golden had been assaulted by juvenile inmates at the instruction of one or more Correction Officers. It was learned that some time during February 26, 2005 Inmate Bobby Golden was attacked by some juveniles while being housed in B Block F Section, during the Classification process. It was further alleged that some Correction Officers had instructed the juvenile inmates to attack Bobby Golden.

Capt. Campbell received reports written by Capt. Taylor, FTO Shane Carson, and Deputy Michael Marble regarding this incident with Inmate Bobby Golden. The reports alleged that Correction Officer Lee Jackson had recruited a juvenile inmate to attack Bobby Golden because Bobby Golden had been arrested and incarcerated in the Harrison Co. Adult Detention Center for domestic abuse on Officer Lee Jackson's former girlfriend. The allegations were made that Correction Officer Lee Jackson had solicited the help of some juvenile inmates to attack Bobby Golden in retaliation for Golden attacking Deputy Jackson's former girlfriend.

On March 3, 2005 Capt. Campbell interviewed Inmate Bobby Golden. It was observed that Inmate Golden had been in some type of physical altercation in that the area around Inmate Golden's eyes had been bruised, as well as some swelling around one of his eyes and an appearance of some superficial cuts. It was further learned that Golden was arrested by the Gulfport Police Dept. for domestic violence and had fought with Gulfport Police Officers. In addition it was learned that when Inmate Golden was in the Booking area at HCADC, he had attacked some of the booking officers and had been sprayed with OC Spray.

During the interview, Inmate Golden stated that while he was being housed in the Classification Section (B/F) on February 26, 2005, some time around noon he was lying on his bed in the Day Room Floor asleep when he was awakened by someone beating him around the head and kicking him in the abdomen area. Golden stated that he was unable to identify who attacked him because he was asleep when the attack occurred. Golden further stated that he was not given any medical treatment until two days after this incident.



EXHIBIT

B-2

Golden stated that the next day, being February 27, 2005 a white Officer and Officer Lee Jackson took him from Section B-F and went to the Booking area and then returned. Inmate Golden stated that the white officer, later learned to be FTO Shane Carson, had instructed the other officers to place Golden in Section B-C which was the Lock-Down Section. Golden stated that FTO Carson then left the Block. Golden stated that after that Deputy Lee Jackson, who he knew to be the former boyfriend of the female whom he assaulted, took him into the recreation yard, put on a pair of gloves and hit him several times and kicked him as well. Golden stated he was then put in the Lock-Down Section.

On March 3, 2005 Capt. Campbell interviewed Deputy Michael Marble who was the Tower Officer for B Block during the day shift on February 26, 2005. Deputy Marble said that some time after he reported to work, which was 11:00 a.m., he was instructed to open the door to the recreation yard to allow the juvenile inmates to use the rec yard. Deputy Marble said some time later he was instructed to open the rec yard door again as well as the door to Section B-F to allow the juvenile inmates to return to Section F. Deputy Marble stated that he learned that an inmate had been attacked and that the Floor Officer, Deputy Lee Jackson and the F Section Officer, Deputy Tippetts was attending to the inmate who was assaulted. The identity of this inmate was Inmate Bobby Golden. Deputy Marble stated that he told the two other deputies that he was going to call Medical and that Deputy Jackson told Deputy Marble not to call Medical; however, Deputy Marble stated that he did call medical personnel on the radio. Deputy Marble stated that a nurse named Mary came down and attended to Golden and treated the wounds he had as a result of the attack. Deputy Marble stated that some time later he observed Deputy Lee Jackson give juvenile inmate Kennedy an extra food tray.

On March 4, 2005 Capt. Campbell interviewed Deputy Michael Tippetts who was assigned as the B Block, F Section Officer on February 26, 2005. Deputy Tippetts stated that some time during the late morning the juvenile inmates were allowed to go in the recreation yard. Deputy Tippetts stated that as the juvenile inmates were returning to Section F he was on the top tier assuring that the inmates would be placed in their cell correctly. Deputy Tippetts stated that some time as the last juvenile inmates were being placed in their cell he heard some type of disturbance downstairs and observed Inmate Bobby Golden walking around in a slumped type position and bleeding from the head. Deputy Tippetts stated that he went down to Inmate Golden and Golden stated that he believed he had been attacked. Deputy Tippetts stated that he took Inmate Golden into the Sally Port area and he and Deputy Jackson and Deputy Chandler attended to the wounds Inmate Golden had suffered and that shortly thereafter, medical personnel arrived to treat the wounds.

During the course of the interview Capt. Campbell asked Michael Tippetts what had happened to Inmate Golden. Deputy Tippetts stated that he did not know what had happened, but he believed that juvenile inmate Kennedy had attacked Inmate Golden. Capt. Campbell also asked Deputy Tippetts if he was aware of Deputy Jackson taking Inmate Golden to the recreation yard and assaulting Inmate Golden. Deputy Tippetts stated that he did not witness this event but he had heard Deputy Jackson tell Deputy

Chandler that he, meaning Inmate Golden, deserved what he got. Deputy Tippetts stated that he believed that Deputy Jackson may have in fact assaulted Inmate Golden.

On March 4, 2005 Capt. Campbell interviewed Deputy Ross Chandler who was assigned as Floor Officer in B Block on February 26, 2005. Deputy Chandler stated that on February 26, 2005 he was actually assigned as the Lock-Down Officer, this being Section C in B Block. Deputy Chandler stated that he had assisted with the juvenile inmates being escorted out to the recreation yard and returning some time later. Deputy Chandler stated that he had assisted with Inmate Golden when he had been attacked in F Section but did not witness anyone who had actually attacked Golden. Capt. Campbell asked Deputy Chandler if he and Deputy Jackson had a conversation regarding Jackson assaulting Inmate Golden in the recreation yard. Deputy Chandler reluctantly admitted that he did in fact know of this incident and that Deputy Jackson had told him that he had taken Inmate Golden to the rec yard and had assaulted him because Inmate Golden had attacked and assaulted his former girlfriend in front of Deputy Jackson's children.

On March 4, 2005 Capt. Campbell interviewed Deputy Lee Jackson regarding the assault on Inmate Golden. Deputy Jackson stated that he did not take part in having any juvenile inmates attack Inmate Golden. Deputy Jackson stated that during his shift on February 26, 2005 he had helped escort the juvenile inmates into the recreation yard and also assisted with their return into F Section and had observed Inmate Golden had obviously been assaulted. Deputy Jackson stated that he assisted with Inmate Golden in the Sally Port and had stood by while the medical personnel arrived. Capt. Campbell asked Deputy Jackson if he had told Deputy Marble not to call Medical for the assault on Inmate Golden. Deputy Jackson stated that he did not say that and that he initially tried to treat the wound that Inmate Golden had on his head.

Capt. Campbell asked Deputy Jackson if he had in fact assaulted Inmate Bobby Golden on February 27, 2005. Deputy Jackson stated that he did not assault Golden and that he was not working in B Block on February 27, 2005. Deputy Jackson stated that he was assigned as Floor Officer in D Block. Capt. Campbell again questioned Deputy Jackson regarding the assault on Inmate Golden in the recreation yard and Deputy Jackson finally admitted that he did in fact hit Inmate Golden while in the recreation yard because Golden assaulted his former girlfriend in front of Deputy Jackson's children.

Capt. Campbell then advised Deputy Jackson that he would be placed on Administrative Leave following the end of Deputy Jackson's shift and that he would be contacted by Maj. Riley for an Administrative Hearing regarding Deputy Jackson's assault on Inmate Bobby Golden. It was learned that an Administrative Hearing was set for March 10, 2005 at 9:00 a.m. which charged Deputy Jackson violating General Order No. 1, 5.8.

On March 11, 2005 Capt. Campbell learned that during the Administrative Hearing on Deputy Jackson on March 10, 2005, Deputy Jackson had told the Hearing Board that FTO Shane Carson had instructed Deputy Jackson to go to B Block and take out his revenge on Inmate Bobby Golden for attacking Deputy Jackson's ex-girlfriend in

front of his children. Maj. Payne advised Capt. Campbell that the Hearing Board had believed Jackson's statement even after Jackson had admitted that he did in fact attack Inmate Bobby Golden. Sheriff Payne had directed Capt. Campbell to expand the investigation regarding FTO Shane Carson's alleged involvement and encouraging Deputy Jackson to attack Inmate Golden.

Capt. Campbell obtained additional reports and documents regarding movement of Deputy Lee Jackson and his assignments on February 26 and 27, 2005. In addition Capt. Campbell learned of assignments of FTO Shane Carson on February 27, 2005. It was learned that Deputy Jackson was in fact assigned to D Block as a Floor Officer on February 27, 2005 along with Deputy Melissa Peterson.

On March 14, 2005 Capt. Campbell interviewed Deputy Melissa Peterson who stated that during the shift on February 27, 2005 she observed that Deputy Jackson had left the Block on several occasions and she stated that on one occasion she had to leave D Block to take some reports to B Block and had observed FTO Shane Carson and Deputy Jackson on the top tier of F Section in B Block. Deputy Peterson stated that she could not remember the exact time that she observed the two Deputies.

On March 14, 2005 Capt. Campbell interviewed FTO Shane Carson regarding his involvement, if any, in the assault or encouraging the assault on Inmate Bobby Golden. FTO Carson stated that when he returned to work on February 27, 2005 he was assigned to Central Control until Deputy Marble could arrive, this time being approximately 11:00 a.m. FTO Carson stated that shortly after Deputy Marble arrived that Deputy Jackson came to Central Control and requested to talk to FTO Carson. FTO Carson stated that Deputy Jackson told him about the situation with Inmate Bobby Golden and that FTO Carson stated he told Deputy Jackson to stay away from B Block and stay away from Inmate Golden. FTO Carson stated that he further told Deputy Jackson that he should go see Capt. Taylor regarding the problem he had with Inmate Golden in hopes of being assigned to some area other than B Block. FTO Carson stated that later on during the day he went to B Block to get Inmate Golden to try to talk to him about being assaulted by the juvenile inmates. FTO Carson stated that when he arrived in B Block he observed that Deputy Jackson was in B Block as well. FTO Carson stated that he got Inmate Golden and took him to the Booking area in hopes of trying to interview him about his assault. FTO Carson stated that Deputy Jackson followed the two into Booking and then FTO Carson stated that he turned around and went back to B Block. FTO Carson stated that he instructed the Officers in B Block to place Inmate Bobby Golden in Lock-Down in C Section and then departed B Block.

Capt. Campbell asked FTO Shane Carson if he had in any way encouraged or suggested that Deputy Lee Jackson retaliate against Inmate Golden for assaulting Deputy Jackson's former girlfriend. FTO Carson stated that he did not in any say insinuate or suggest that he attack or take any revenge on Inmate Golden.

It was determined that due to the conflicting statements between Deputy Jackson and FTO Carson that FTO Carson submit to a polygraph examination which FTO Carson volunteered to take regarding the allegation Deputy Jackson made against FTO Carson. On March 15, 2005 approximately 10:00 a.m. FTO Shane Carson submitted to a polygraph exam with Mr. Joe Allen regarding the allegation Deputy Jackson made that FTO Carson suggested that he retaliate against Inmate Golden. Approximately 11:30 a.m. on March 15, 2005 Mr. Allen called Capt. Campbell and advised Capt. Campbell that FTO Carson had passed the polygraph and did not show any deception when asked if he in any way suggested or encouraged Deputy Jackson to retaliate against Inmate Golden.

**Findings and Conclusions**

It was concluded from this investigation that by his own admission, Deputy Lee Jackson did in fact assault Inmate Bobby Golden in retaliation for Golden assaulting Deputy Jackson's ex-girlfriend in front of Deputy Jackson's children. It was ALSO concluded from this investigation that Deputy Jackson acted alone and was not assisted or encouraged by any other Deputy to retaliate against Inmate Golden. Deputy Jackson was charged with violating **General Order # 1,5.8**, "*.....His office gives him no right to prosecute the violator or to mete out punishment for the offense.......*", in that on February 27, 2005, by his own admission, he took inmate Bobby Golden to the B Block recreational yard and assaulted him. This allegation against Deputy Jackson is *SUSTAINED*.

It was further concluded that the allegation made by Deputy Jackson that FTO Shane Carson had encouraged or suggested that Deputy Jackson retaliate against Inmate Golden for assaulting Deputy Jackson's former girlfriend in front of Deputy Jackson's children was *UNFOUNDED*.

| Report By: | Reviewing Supervisor |
|---|---|
| Captain Steve Campbell | Sheriff George Payne |

# HARRISON COUNTY SHERIFF'S DEPARTMENT

## GEORGE PAYNE, SHERIFF

| ☐ Juvenile Involved | Harrison County Adult Detention Center NARRATIVE FORM | | Case # | |
|---|---|---|---|---|
| ☒ Original Report<br>☐ Offense Supplement<br>☐ Custody Supplement | Type Incident/Crime<br>**INFORMATIONAL** | Date of This Report<br>**02/28/05** | Date of Original Report<br>**02/27/05** | |
| | Suspect / Victim Name<br>**INFORMATIONAL** | | List Complaint Numbers of Connected Case | |

On February 27, 2005 Field Training Officer Carson #276 was assigned as Central Control Officer. FTO Carson heard that an incident occurred in B-Block F-Section on Saturday February 26, 2005 involving an Officer giving Juvenile Inmates extra food trays to jump on another inmate. FTO Carson attempted to notify Captain Taylor via cell phone but could not make contact with him (Captain Taylor). FTO Carson did not want to report the incident to Sergeant Collins due to the incident happening on his shift and did not know if he (Collins) was apart of the incident or not. Deputy Marble was also working Central Control and advised FTO Carson that he (Marble) was in B-Control when the incident happened and did not know if he (Marble) should of wrote a narrative or what to do. FTO Carson had the inmate that was said to have been jumped moved from B-Block F-Section Dayroom to B-Block C-Section cell 221. On February 28, 2005 FTO Carson completed headcount in A-Block and met with Captain Taylor to brief him of said incident. Captain Taylor advised FTO Carson to bring Inmate Golden to his office. FTO Carson entered B-Block C-Section cell 221 and retrieved inmate Bobby Golden (said victim) and escorted him to Captain Taylor's Office. An interview was conducted with inmate Bobby Golden FTO Carson and Captain Taylor. Upon completion of the interview FTO Carson escorted inmate Golden to medical to get screened by a nurse. While inmate Golden was being checked FTO Carson started interviewing Juvenile Inmates to see which Juveniles were involved with the situation and what happened. While in B-Block F-Section Deputy Tippets continued saying that nothing happened in B-Block F-Section on Saturday because he (Tippets) was present at all times and nothing happened. FTO Carson continued to ask all inmates cell by cell but observed Deputy Tippets following behind him and seeing what the Juvenile inmates said. FTO Carson had already directed Deputy Tippets to go back down on the bottom tier that he (Carson) was alright. FTO Carson could not identify the Juvenile inmates that jumped on inmate Bobby Golden but did

| DISPOSITION |
|---|
| A. Cleared Adult Arrest ☐ |
| B. Cleared Exceptional Adult ☐ |
| C. Cleared Juvenile Custody ☐ |
| D. Cleared Exceptional Juvenile ☐ |
| E. Unfounded ☐ |
| F. Other-Cleared Exceptional ☐ |
| G. Suspended Closed ☐ |

| Reporting Officer:<br>**No. 276    Name CARSON** | Division<br>**Corrections** (Jail) | Reviewing Supervisor<br>No.        Name | Disposition Date |
|---|---|---|---|

White = Records Canary = Agency Use Pink = Court/Detectives Gold = Shift Capt / Jail
Page 01 of 01



**EXHIBIT**

B-3

# HARRISON COUNTY SHERIFF'S DEPARTMENT

## GEORGE PAYNE, SHERIFF

identify that the Juvenile Inmates that jumped on him (Inmate Golden) received an extra tray for jumping on inmate Bobby Golden by either Deputy Jackson or Deputy Tippets. FTO Carson verified that Deputy Jackson was assigned to B-Floor and Deputy Tippets was assigned to Juvenile Officer (B-Block F-Section) on February 26, 2005 (the date the incident occurred). FTO Carson arrived back in Medical to escort inmate Golden back to Captain Taylor's Office where more questions were asked. FTO Carson then escorted inmate Golden back to B-Block C-Section cell 221. Medical advised that inmate Bobby Golden will be on the list to see the doctor tomorrow (March 1, 2005). End of narrative.

# HARRISON COUNTY SHERIFF'S DEPARTMENT

## GEORGE PAYNE, SHERIFF

| ☐ Juvenile Involved | Harrison County Sheriff's Office<br>NARRATIVE FORM | | Case # |
|---|---|---|---|
| ☒ Original Report<br>☐ Offense Supplement<br>☐ Custody Supplement | Type Incident/Crime:<br>Informational | Date of This Report<br>3/1/05 | Date of Original Report<br>3/1/05 |
| | Suspect/Victim Name:<br>Golden, Bobby Doc# 269382 | | List Complaint Numbers of Connected Case |

February 28, 2005 to March 1st, 2005 Deputy Geas #322 conducted an informal investigation of allegations made by inmate Bobby Golden Docket # 269382 concerning assault by juveniles on the person of inmate Bobby Golden. Inmate Golden was placed in BC-221 for his (Golden) protection on February 27th, 2005.

On February 28, 2005, I Deputy Geas #332 was conducting disciplinary hearings and opened a cell to speak with another inmate and noticed inmate Golden's condition. Deputy Geas #322 asked what happened to the inmate?

Inmate Golden went on to explain that while in the classification unit he (Golden) was assaulted by three to four juveniles who jumped him (Golden) by hitting him (Golden) in the head and stomping on his (Golden) ribsPrior to entering the lockdown unit Deputy Geas #322 spoke with several juvenile inmates and was given information of at least two names to speak with. Deputy Geas #322 got their names and interviewed inmate Willie Bridges Doc #268827 and inmate Darrell Walker Doc# 267630. Inmate Bridges denied any involvement, which later in the investigation proved to be true. Inmate Walker after some discussion gave some names and denied any involvement in this matter until later found in the investigation that inmate Walker was one of the primary aggressors against inmate Golden.

On February 28, 2005 inmate Golden was interviewed by Captain Taylor, while on the phone, inmate Golden informed Deputy Geas #322 that an inmate in the classification unit could possibly be a witness but only knew the inmate by the first name of Michael. Deputy Geas #322 got a copy first of the classification movement sheet and determined that inmate Michael Barbour Doc #269285 was a potential witness.

On February 28, 2005 at approximately 1700 hours Deputy Geas #322 went to D-block and asked inmate Barbour if he (Barbour) knew about any juveniles assaulting an inmate. Inmate Barbour stated, "Yes I (Barbour) do, it was a terrible thing they did to that old man". At this time Deputy Geas #322 then made the decision to escort inmate Barbour to Captain Taylor's office for further conversation and investigation by Captain Taylor. Inmate Barbour described a black juvenile with floppy hair that lived in the bottom cell #147, later identified as inmate John E. Kennedy Jr. Doc #257015 as the ring leader of the assault on inmate Golden. Captain Taylor then completed the interview with this inmate.

On March 1st, 2005 Deputy Geas #322 continued the investigation into the assault on inmate Golden. Deputy Geas #322 then spoke with several inmates that were in B-block classification unit or been moved to other blocks throughout the facility. Each inmate was shown 16 pictures of the juveniles housed in B-block, F-section for identification purposes. Only one inmate could definitely identify the four juveniles involved in this incident.

At 0900 Deputy Geas #322 interviewed the following inmates one at a time and separately in the disciplinary office. Each

**DISPOSITION**
A. Cleared Adult Arrest ☐
B. Cleared Exceptional Adult ☐
C. Cleared Juvenile Custody ☐
D. Cleared Exceptional Juvenile ☐
E. Unfounded ☐
F. Other/Cleared Exceptional ☐
G. Suspended Closed ☐

| Reporting Officer<br>No: 322    Name: Geas | Division<br>Corrections | Reviewing Supervisor<br>No: 151 Name: Taylor | Disposition Date<br>3/1/05 |
|---|---|---|---|

White = Records  Canary = Agency Use  Pink = Court/Detectives  Gold = Shift Capt / Jail Page __1__ of __2__

**EXHIBIT**

B-4

# HARRISON COUNTY SHERIFF'S DEPARTMENT

## GEORGE PAYNE, SHERIFF

inmate was informed that no one was in trouble and that this was an investigation into alleged abuse on a fellow inmate.

Inmate Le, Trong Doc #269331 was the first questioned by Deputy Geas #322. Inmate Trong stated, " We were moved to the back of the section near the section bathroom so that we couldn't have contact with any juveniles. It was funny inmate Golden was never wakened or told to move, I (Trong) thought this was weird. Then the juveniles came in from the yard and into the section fast and four black males attacked inmate Golden, punching and kicking the man making him (Golden) bleed. A white officer just stood there and watched and didn't try to stop the fight. A young skinny tall black officer looked into the section and then left and didn't say anything.

Inmate Kenneth Kenzierski Doc # 269379 was interviewed and stated, " I (Kenzierski) was asleep when inmate Golden stepped on him (Kenzierski) trying to avoid the juveniles attacking him (Golden) Inmate Kenzierski was unable to identify any of the juveniles attacking inmate Golden.

Inmate Richard Foxworth Doc #269377 was interviewed and stated, "I (Foxworth) was told by inmate Kennedy, the kid with big mouth that they jumped inmate Golden because this was inmate Kennedy's aunt. Inmate Golden kept asking the inmates to stop. The officer let it go on for a few minutes before stopping the incident. The officer was a medium built white officer.

Inmate Jerrod Lee Doc #269355 was interviewed last down in B-block, rover room. Inmate Lee stated, "The inmates were paid extra food trays to assault the old man. It appeared to me (Lee) that the officers had been talking to each other about this because one of them mentioned that this was his babies momma. One officer was medium built and white the other was tall, gray haired, wearing glasses and black. Prior to the juveniles returning from the yard all of the adults were ordered to stand over by cell-148 so they couldn't have contact with the juveniles. The only one that wasn't told to move was inmate Golden who was by the door sleeping. As the juveniles came in from the yard four them jumped inmate Golden stomping, kicking and punching him (Golden) causing bleeding to the head area. The officers didn't appear to stop it.

Inmate Lee picked out four juveniles inmates via a picture lineup and identified the following juveniles:

John E. Kennedy Jr. 257015
Henry Lindsey        266339
Walker, Darrell 267630
Blakney, Germaine        268397

All four of these juveniles were questioned concerning this incident on 2/28/05 and denied any involvement. Copies of pictures included. Captain Taylor #18 notified. End of report.

## W. J. ALLEN & ASSOCIATES

228-669-7474                                                      16195-B Landon Road
wjallen@cableone.net                                            Gulfport, MS 39503

March 15, 2005

## POLYGRAPH EXAMINATION REPORT

To:     Captain Steve Campbell
        Harrison County Sheriff's Department
        P. O. Box 1480
        Gulfport, MS   39502

Re:  Shane Carson

On 03-15-05, at your request, I conducted a specific issue polygraph examination of your employee, Shane Carson , in conjunction with your internal investigation into an allegation by Deputy Lee Jackson that Deputy Carson instructed him to handle his business with an inmate, Bobby Golden. The case facts and other circumstances surrounding the allegation were provided to me in conversation with you prior to the examination.

During the pretest interview, Deputy Carson denied he gave Deputy Jackson permission to beat inmate Golden.

After discussing and reviewing all questions to be asked, charts were collected using the Comparison Question Technique (CQT). The relevant questions on all charts were as follows:

R5.   Did you tell Deputy Jackson to handle his business with inmate
       Golden?

Answer   no



EXHIBIT

B-5



March 15, 2005

## POLYGRAPH EXAMINATION REPORT

To:    Captain Steve Campbell
       Harrison County Sheriff's Department
       P. O. Box 1480
       Gulfport, MS   39502

Re:  Shane Carson

On 03-15-05, at your request, I conducted a specific issue polygraph examination of your employee, Shane Carson, in conjunction with your internal investigation into an allegation by Deputy Lee Jackson that Deputy Carson instructed him to handle his business with an inmate, Bobby Golden. The case facts and other circumstances surrounding the allegation were provided to me in conversation with you prior to the examination.

During the pretest interview, Deputy Carson denied he gave Deputy Jackson permission to beat inmate Golden.

After discussing and reviewing all questions to be asked, charts were collected using the Comparison Question Technique (CQT). The relevant questions on all charts were as follows:

R5.  Did you tell Deputy Jackson to handle his business with inmate
     Golden?



Answer  no

Identifi v 4.0 Results
P.O.Box 11422
Olympia, WA  98508
(360) 236-7860

SUBJECT:              CARSON,SHANE
Examiner:  Joe Allen
Analysis Time and Date:  08:41:54 03-16-2005
Examination: Zone Comparison Technique
Scale: 7 Point Scale

Relevant Questions
  R5  Did you tell Deputy Jackson to handle his business with inmate Golden?
  R10  Did Deputy Jackson have your permission to punish inmate Golden?
  R7  Did you tell or imply to Deputy Jackson that he had your permission to beat inmte Golden?

Charts, Question Labels and Scores
  An E indicates excluded data.

| Chart 1: | 1 | 2 | 3 | C4 | R5 | C6 | R7 | 8 | C9 | R10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Respiration | | | | | 0 | | -1 | | | -1 |
| Electrodermal | | | | | 1 | | -1 | | | -1 |
| Cardio | | | | | 2 | | -2 | | | 2 |
| SUM | | | | | 3 | | -4 | | | 0 |

-1

| Chart 2: | 1 | 2 | 8 | C6 | R10 | C9 | R5 | 3 | C4 | R7 |
|---|---|---|---|---|---|---|---|---|---|---|
| Respiration | | | | | 0 | | 0 | | | -1 |
| Electrodermal | | | | | -1 | | -1 | | | 1 |
| Cardio | | | | | 2 | | -1 | | | 2 |
| SUM | | | | | 1 | | -2 | | | 2 |

1

| Chart 3: | 1 | 2 | 3 | C9 | R7 | C4 | R10 | C6 | R5 |
|---|---|---|---|---|---|---|---|---|---|
| Respiration | | | | | 2 | | -1 | | -2 |
| Electrodermal | | | | | 1 | | -1 | | 1 |
| Cardio | | | | | 2 | | 2 | | 3 |
| SUM | | | | | 5 | | 0 | | 2 |

| Spot Scores | 1 | 2 | 3 | C4 | R5 | C6 | R7 | 8 | C9 | R10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 3 | | 3 | | | 1 |

7

Total for Charts: 7
NO DECEPTION INDICATED
RELIABILITY:  93.816  Percent

The RELIABILITY percentage is not valid unless a minimum of three charts were administered and the
examination was the DoDPI ZCT format consisting of three relevant and three comparison questions per chart.
No data or labels were changed in version 4.0

Identifi V4.0, Copyright 2000.  All Rights Reserved.
The licensed user of Identifi v4.0 Serial# 24 is:  Joe Allen
se by any other is a violation of the License Agreement.

COPY

Deputy Shane Carson  report
Page 2

R7.  Did you tell or imply to Deputy Jackson that he had your permission to
beat inmate Golden?

Answer  no

R10.  Did Deputy Jackson have your permission to punish inmate Golden?

Answer  no

It is my opinion, based on the charts, that Shane Carson did not exhibit responses consistent with deception to any of the relevant questions and that he did answer truthfully about that matter.

A copy of the computer scoring, confirming, but not considered in reaching this opinion are enclosed for your information.  Please call if you have questions (228.669.7474).

COPY

Submitted 03-15-05

William J. Allen
Mississippi Polygraph License #6

Deputy Shane Carson report
Page 2

    R7.  Did you tell or imply to Deputy Jackson that he had your permission to beat inmate Golden?

                                 Answer  no

    R10. Did Deputy Jackson have your permission to punish inmate Golden?

                                 Answer  no

    It is my opinion, based on the charts, that Shane Carson did not exhibit responses consistent with deception to any of the relevant questions and that he did answer truthfully about that matter.

    A copy of the computer scoring, confirming, but not considered in reaching this opinion are enclosed for your information.  Please call if you have questions (228.669.7474).

Submitted 03-15-05

*William J. Allen*

William J. Allen
Mississippi Polygraph License #6

Identifi v 4.0 Results
P.O.Box 11422
Olympia, WA 98508
(360) 236-7860

SUBJECT:                CARSON,SHANE
Examiner: Joe Allen
Analysis Time and Date: 11:17:32 03-15-2005
Examination: Zone Comparison Technique
Scale: 7 Point Scale

Relevant Questions
 R5  Did you tell Deputy Jackson to handle his business with inmate Golden?
R10  Did Deputy Jackson have your permission to punish inmate Golden?
 R7  Did you tell or imply to Deputy Jackson that he had your permission to beat inmte Golden?

Charts, Question Labels and Scores
 An E indicates excluded data.

| Chart 1: | 1 | 2 | 3 | C4 | R5 | C6 | R7 | 8 | C9 | R10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Respiration | | | | | 0 | | -1 | | | -1 | |
| Electrodermal | | | | | 1 | | -1 | | | -1 | |
| Cardio | | | | | 2 | | -2 | | | 2 | |
| SUM | | | | | 3 | | -4 | | | 0 | |
| | | | | | | | | | | | -1 |

| Chart 2: | 1 | 2 | 8 | C6 | R10 | C9 | R5 | 3 | C4 | R7 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Respiration | | | | | 0 | | 0 | | | -1 | |
| Electrodermal | | | | | -1 | | -1 | | | 1 | |
| Cardio | | | | | 2 | | -1 | | | 2 | |
| SUM | | | | | 1 | | -2 | | | 2 | |
| | | | | | | | | | | | 1 |

| Chart 3: | 1 | 2 | 3 | C9 | R7 | C4 | R10 | C6 | R5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Respiration | | | | | 2 | | -1 | | -2 | |
| Electrodermal | | | | | 1 | | -1 | | 1 | |
| Cardio | | | | | 2 | | 2 | | 3 | |
| SUM | | | | | 5 | | 0 | | 2 | |
| | | | | | | | | | | 7 |

| Spot Scores | 1 | 2 | 3 | C4 | R5 | C6 | R7 | 8 | C9 | R10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 3 | | 3 | | | 1 |

Total for Charts: 7
NO DECEPTION INDICATED
RELIABILITY:  93.816  Percent

The RELIABILITY percentage is not valid unless a minimum of three charts were administered and the
examination was the DoDPI ZCT format consisting of three relevant and three comparison questions per chart.
No data or labels were changed in version 4.0

Identifi V4.0, Copyright 2000.  All Rights Reserved.
The licensed user of Identifi v4.0 Serial# 24 is:  Joe Allen
Use by any other is a violation of the License Agreement.