```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                          SOUTHERN DIVISION


   BOBBY J. GOLDEN,
        Plaintiff,

   VERSUS                              CAUSE NO: 1:06cv1006LG-JMR


   HARRISON COUNTY, MISSISSIPPI;
   SHERIFF GEORGE PAYNE,
   OFFICIALLY AND IN HIS
   INDIVIDUAL CAPACITY; LEE OATIS
   JACKSON, OFFICIALLY AND IN HIS
   INDIVIDUAL CAPACITY; MAJOR
   DIANNE GASTON-RILEY,
   OFFICIALLY AND IN HER
   INDIVIDUAL CAPACITY; CAPTAIN
   RICK GASTON, BOOKING
   SUPERVISOR, OFFICIALLY AND IN
   HIS INDIVIDUAL CAPACITY;
   CAPTAIN PHILLIP TAYLOR,
   OFFICIALLY AND IN HIS
   INDIVIDUAL CAPACITY; JOHN DOES
   1-5, OFFICIALLY AND IN THEIR
   INDIVIDUAL CAPACITY,
        Defendants.
```

**DEPOSITION OF BOBBY J. GOLDEN**

Taken at the offices of Dukes, Dukes, Keating & Faneca, P.A., 2909 13th Street, Sixth Floor, Gulfport, Mississippi, on Friday, February 15, 2008, beginning at 9:56 a.m.

EXHIBIT E

1    Q.    What did he look like?
2    A.    Short guy, sort of stocky.
3    Q.    Was he white?
4    A.    White.
5    Q.    And he was in the -- behind the glass in
6    the booking area?
7    A.    Yes.
8    Q.    And then what happened next?
9    A.    Well, I beat on the door and he kept
10   telling me, stop beating on the door.
11   Q.    Had your handcuffs been removed at that
12   time?
13   A.    Yes.
14   Q.    Okay. What door were you beating on?
15   A.    Booking room door.
16   Q.    And the officer that was behind the
17   glass was next to this door?
18   A.    He was like in front of it.
19   MS. BROOM:
20         All right. The booking room door, what
21   door are you talking about there? Clarify that a
22   little bit.
23   THE WITNESS:
24         The holding cell door.
25   MS. BROOM:

1        So you were in the holding cell?
2   THE WITNESS:
3        Yes.
4   MR. TINER:
5        Q.   And you were beating from inside the
6   holding cell?
7        A.   Well, not beating. Knocking on it. It
8   might have been beating to him.
9        Q.   Okay. Well, if you would, describe how
10  you were knocking.
11       A.   Well, I knocked like -- you know, how
12  you tap on the glass. I kept asking to use a
13  phone call. He said, like, just wait till, you
14  know, we process you. So I kept asking and kept
15  asking. So I guess it must have irritated him, so
16  he opened the door and punched me in the eye.
17       Q.   Okay. This is that same officer, the
18  short guy?
19       A.   The same short guy, same officer, yes.
20  MS. BROOM:
21       When you were talking to him asking to
22  use the phone, were y'all talking through the wall
23  or did he open --
24  THE WITNESS:
25       Through the glass.

```
 1    THE WITNESS:
 2           In the shower.
 3    MR. TINER:
 4        Q.   So he came in your cell?
 5        A.   Yes.
 6        Q.   Did he issue any commands for you to sit
 7    down or, you know, stop yelling?
 8        A.   Just shut up and wait till we get to
 9    you.
10        Q.   And did you continue after he gave that
11    instruction?
12        A.   Yes.
13    MR. TINER:
14           Can we take a quick break?
15               (Off the record.)
16    MR. TINER:
17        Q.   Back to the booking area.
18           Now, you say that whenever you came in,
19    your handcuffs had been removed and you were
20    placed in a holding cell?
21        A.   Yes.
22        Q.   And then you began asking for your phone
23    call and asking what the charges were against you,
24    correct?
25        A.   Correct.  Yes.
```

1  Q. And whenever you did not get a response,
2  you began banging on or, as you say, knocking on
3  the door; is that correct?
4  A. Yes.
5  Q. And then as the officer approached you
6  through the other side of the door, did he give
7  you instruction at that time to stop knocking on
8  the door, to sit down, or what happened at that
9  point?
10 A. It was like a shut up, we'll get to you.
11 Q. Okay. And then you continued on
12 knocking on the glass?
13 A. Not right then, but later on.
14 Q. How much longer after that?
15 A. Probably about five minutes later.
16 Q. And so you initiated the knocking again
17 five minutes later?
18 A. Yes.
19 Q. And what happened exactly after that?
20 Just take me step by step.
21 A. He came back to the -- back to the cell
22 door and said something about some sheriff's there
23 or something, so he walked away and then went to
24 talk to this other deputy. And then I started
25 back banging again. He came back and said like he

1  was getting ready to book me in or something like
2  that -- process me.  He said he was getting ready
3  to process me and I can make my phone call.
4       Q.   All right.
5       A.   So right in that time, you know, he done
6  turned around again.  I started back beating.
7  That time he came, and, you know, I remember him
8  punching me and spraying me down with mace.
9       Q.   And how did he open the door and punch
10 you?
11      A.   This was in the shower area.
12      Q.   Okay.  How did he get from the outside
13 of the cell to the inside of the --
14      A.   He opened the door.
15      Q.   So where is the shower located?
16      A.   I can't remember exactly.  I think
17 it's --
18      Q.   Is it on the back wall?
19      A.   No.  This was in a -- I think it was in
20 a different room.
21      Q.   And so how did you go from the cell to a
22 different room?  When did that occur?
23      A.   He escorted me over and told me, you
24 know, get in the shower because he sprayed me down
25 with mace, told me to wash the pepper spray or

1  you, what do you think his age was, approximately
2  how old?
3  THE WITNESS:
4        He was a young guy, probably about 24,
5  25.
6  MR. TINER:
7     Q.   Now, back to whenever -- you said
8  that -- you testified that you did not follow the
9  officer's instruction; is that correct?
10    A.   Yes.
11    Q.   And you don't recall if you were cursing
12  or not?
13    A.   No. I don't recall cursing because I
14  was drunk, intoxicated.
15    Q.   Okay. And do you believe a reasonable
16  amount of use of force is justifiable when an
17  inmate is combative?
18  MR. COOPER:
19        Objection. Irrelevant. Misleading.
20  MR. TINER:
21    Q.   You can answer.
22        Do you believe that there is a
23  justifiable amount of force whenever an inmate is
24  being combative?
25    A.   What do you mean?

```
 1         Q.    Okay.  So you were acting -- what does
 2    that mean to be intoxicated?  Do you act
 3    differently when you're intoxicated?
 4         A.    I possibly was a little mad, but --
 5         Q.    Okay.  And what is "a little mad"?
 6         A.    I guess mad enough to wind up in jail.
 7         Q.    But I'm not talking about the domestic
 8    violence incident.  I'm talking about now that
 9    we're in the booking room.
10               You said you were mad and knocking on
11    the door.  But you were drunk; is that correct?
12         A.    Well, I was just trying to bond out.
13         Q.    But you were mad at the time, you were
14    angered?
15         A.    I guess, yes.
16    MS. BROOM:
17               Did you ever make any aggressive steps
18    towards the officer?
19    THE WITNESS:
20               Oh, no.
21    MR. TINER:
22               Did you ever physically touch the
23    officer?
24    THE WITNESS:
25               No.  No.  I couldn't touch him because I
```

1   Q.   Okay.  Do you allege that Sheriff Payne
2   or Major Riley or Mr. Jackson or Captain Taylor
3   participated in this event or had any knowledge of
4   this event?
5   MR. COOPER:
6       Just for clarity, what incident?
7   MR. TINER:
8       The booking area.
9   A.   Did they know about it?  They questioned
10  me about it.
11  MR. TINER:
12  Q.   But I'm speaking specifically about
13  Sheriff Payne, Major Riley, Officer Jackson, and
14  Phillip Taylor.  Did they participate in this
15  incident?
16  A.   In the booking room?
17  Q.   Right.
18  A.   No.  Just those two officers.
19  Q.   Were they aware that it had occurred at
20  that time?
21  MR. COOPER:
22      Objection.  Calls for speculation.
23  MR. TINER:
24  Q.   Okay.  But you can answer it.  Do you
25  believe that they were aware of this incident at

Case 1:06-cv-01006-LG-JMR    Document 110-8    Filed 07/07/08    Page 10 of 19

66

```
 1              Is that here in Gulfport?
 2   THE WITNESS:
 3              Yes.
 4   MR. TINER:
 5        Q.    Okay.  And then what happened after you
 6   went to the nurse?
 7        A.    She give me some ibuprofen and -- but I
 8   still ain't finished telling the whole thing.
 9        Q.    Okay.  Go ahead.
10        A.    After the inmates had assaulted me,
11   Jackson wound up assaulting me after that.
12        Q.    Okay.  And we're going to get into that.
13   I'm trying to just segregate each of the incidents
14   as they occurred.
15              After you were in the nurse's office,
16   were you taken back to your cell?
17        A.    Actually, I was taken back to isolation.
18        Q.    Okay.  I guess you're by yourself in
19   isolation?
20        A.    Yes.
21        Q.    All right.  Now, I'm going to ask you
22   again:  Regarding the juvenile incident, was
23   Sheriff Payne, was Major Riley, was Captain Taylor
24   present at this incident with the juveniles?
25        A.    No.
```

```
 1    on me.
 2         Q.    Okay.  But the incident that occurred.
 3         A.    Oh, no.
 4         Q.    There was no other witnesses besides you
 5    and Officer Jackson?
 6         A.    No.
 7         Q.    The other officers that were --
 8         A.    Well, the other officers was on the
 9    inside.  I don't know if one of them saw it.
10         Q.    Okay.  Do you know if you were in the
11    sightline of wherever they were located?
12         A.    I don't know because like when he was
13    jumping up -- when he was jumping on me, I was
14    like right up against the door, I guess, probably
15    out of camera sight, out of vision.
16         Q.    So this was near some entrance to the --
17         A.    Yes.  Like you going out to the
18    recreation yard.
19         Q.    Okay.  And Officer Jackson indicated to
20    you that he was doing this because you had
21    assaulted his girlfriend?
22         A.    Yes.  That's pretty much what he said.
23         Q.    Okay.  In front of the children or --
24         A.    In front of the children.
25         Q.    And he said it was in front of the
```

```
 1   children?
 2        A.   Yes.  That's what he said.
 3        Q.   So it was kind of a personal vendetta?
 4        A.   Yes.
 5        Q.   How long did the incident occur?
 6        A.   Probably about five minutes.
 7        Q.   And then whenever you were brought to
 8   isolation, what happened after that?
 9        A.   That was it.  They locked me down.
10        Q.   So that was the period of 15 days that
11   you were --
12        A.   Yes.
13        Q.   Any other details you can remember about
14   this specific incident?
15        A.   That's about it.
16        Q.   And then what parts of your body were
17   injured?  I know we talked earlier about injuries
18   from the juveniles.  But can you differentiate
19   parts that were injured from Officer Taylor?
20        A.   Probably my ribs and my shoulder.
21        Q.   But your ribs had already --
22        A.   Been fractured.  But he kicked them in
23   the same spot.
24        Q.   So your ribs and your shoulder were
25   injured at this time?
```

```
 1      A.   Yes.
 2      Q.   Were there any other inmate witnesses?
 3      A.   What do you mean, watching this happen?
 4      Q.   Yes.  Did any inmate observe?
 5      A.   No.  They saw me right after it
 6  happened.
 7      Q.   Okay.  Who saw you right after it
 8  happened?
 9      A.   I can't remember the guy's name.
10      Q.   What did he look like?
11      A.   Little, short, fat guy, one of his
12  eyes -- I think he just got one eye because one of
13  his eyes look like glass.
14      Q.   Was he a white or black guy?
15      A.   Black dude.
16      Q.   Was he old or young?
17      A.   Young.  He's probably, I'd say 31 or 32.
18      Q.   Okay.  And you had spoke with him about
19  what had just occurred?
20      A.   Yes.
21      Q.   You don't remember his name?
22      A.   No.
23      Q.   Were you bleeding anywhere?
24      A.   My eyes was bleeding.
25      Q.   Okay.  Which eye was bleeding?
```

1      A.    My right eye.

2      Q.    So the same eye that was injured from

3  the booking area?

4      A.    Right.  But it was the top part that was

5  bleeding this time instead of the bottom.

6      Q.    Okay.  I'm going to ask you again:  In

7  this incident, was the sheriff, Major Riley,

8  Captain Taylor, were they there at this incident?

9      A.    No.

10     Q.    And to your knowledge, they were not

11 aware of what occurred there?

12 MR. COOPER:

13         Objection.  Speculation.

14 MR. TINER:

15     Q.    At the time.

16     A.    I don't know.

17     Q.    All right.  Have you ever talked to any

18 other inmates about these incidents besides the

19 short, fat guy?

20     A.    Yes.  When I was going to court, a

21 friend of mine, he was in jail.  He was a trustee.

22     Q.    What's his name?

23     A.    Rodney McRay.

24     Q.    McRay.  And he was a trustee at that

25 time?

1   A.   Yes.  I would think they is.  If they
2   wasn't, they wouldn't have been trying to hurt me.
3   Q.   Okay.  But do you believe they were
4   based on race?  Was it a racial discrimination?
5   A.   I don't know.  I don't think so.
6   Q.   Okay.  How about based on your age?
7   Were they discriminating against you on your age?
8   MR. COOPER:
9        Objection.
10  A.   I don't know.
11  MR. TINER:
12  Q.   How about your religion on your national
13  origin?
14  A.   No, it couldn't have been, couldn't have
15  been my religion.
16  Q.   Okay.  I'm going to Count Number 3,
17  which is action for neglect or failure to prevent
18  conspiracy.
19       What facts support this cause of action?
20  A.   What do you mean by that?
21  Q.   What facts that we've discussed today
22  support a cause of action for neglect or failure
23  to prevent conspiracy, if you're aware?
24  MR. COOPER:
25       Again, I object.  It calls for a legal

```
 1    conclusion.
 2    MR. TINER:
 3         Q.   Just asking for facts.
 4         A.   It's like they tried to cover it up.
 5    They wouldn't let me get no visit.
 6         Q.   Okay.  Did they fail in their duties to
 7    you at the jail?
 8         A.   Yeah.  Yes.
 9    MS. BROOM:
10         In your complaint, you're alleging a
11    conspiracy, why do you think there was a
12    conspiracy?
13    MR. COOPER:
14         Again, I object.  Calls for a legal
15    conclusion.
16    THE WITNESS:
17         Why do I think it was a conspiracy?
18    MS. BROOM:
19         Yes.
20    THE WITNESS:
21         If you pay an inmate a tray to beat up
22    somebody, what would you call it?  That's
23    conspiracy.
24    MS. BROOM:
25         Who do you think was part of that
```

```
 1   conspiracy?
 2   THE WITNESS:
 3           Lee Oatis Jackson.
 4   MS. BROOM:
 5           Who else?
 6   THE WITNESS:
 7           The inmate -- guard that was on duty
 8   with him because he was sitting there watching.
 9   The one that was -- Thompson or whatever officer
10   it was that escorted me up -- that they say they
11   was escorting me to the medical, but they didn't
12   take me to the medical.  They took me behind the
13   yard and beat me.
14   MS. BROOM:
15           Anybody else part of the conspiracy that
16   you're alleging that was present?
17   THE WITNESS:
18           I would say Taylor, too, if he, you
19   know, brought it to the sheriff's attention, it
20   probably, you know, wouldn't have went that far.
21   MS. BROOM:
22           What do you mean wouldn't have gone that
23   far?
24   THE WITNESS:
25           Probably would have been prevented; you
```

1    know what I'm saying?
2    MS. BROOM:
3         Do you think the sheriff was part of
4    this conspiracy?
5    THE WITNESS:
6         I don't know.
7    MS. BROOM:
8         Do you think Dianne Gaston-Riley was
9    part of the conspiracy?
10   MR. COOPER:
11        Objection. I think that applies to all.
12   MS. BROOM:
13        I'm sorry. What was the objection?
14   MR. COOPER:
15        You asked about Sheriff Payne. I think
16   he said he didn't know. And Dianne Riley, I
17   object simply because I think the answer applies
18   to all. And it calls for a legal conclusion.
19   MS. BROOM:
20        Okay.
21   THE WITNESS:
22        Like I said, I don't know. I would say
23   if Taylor had told the sheriff and the rest of
24   them and they didn't do nothing about, it's like
25   conspiracy because they covering it up.

MS. BROOM:

    Okay. Do you know if Taylor told the sheriff?

THE WITNESS:

    No, I don't know. If he didn't, that's pretty much conspiracy there.

MR. TINER:

    Q. I'm going to go on to Count 4, which is on Page 9, which is failure to adequately train and supervise.

    Are you aware of how officers are trained?

    A. Not really. No, I'm not.

    Q. Just in your -- from your perspective, how did the defendants fail to train or supervise Officer Jackson?

MR. COOPER:

    Again, I'm going to object. It requires a legal conclusion.

    A. I can't answer that because I don't know how they trained.

MR. TINER:

    Q. Okay. Are you alleging that their policies were inadequate?

    A. Yes.